Lawrence J. Friedman (Texas Bar No. 07469300)
James Robert Krause (Texas Bar No. 11714525)
Del W. Mecham, Jr. (Texas Bar No. 24037085)
**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
Telephone: (972) 788-1400
Facsimile: (972) 788-2667

ATTORNEYS FOR PLAINTIFF MILL CREEK PRESS, INC. d/b/a ADVANCED ART

Robert M. Chiaviello, Jr. (Texas Bar No. 04190720)
Brett Govett (Texas Bar No. 08235900)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

ATTORNEYS FOR PLAINTIFF TUESDAY MORNING CORPORATION




**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MILL CREEK PRESS, INC. d/b/a ADVANCED ART and TUESDAY MORNING CORPORATION,** | § | |
| | § | |
| **Plaintiffs,** | § | **No. 3-04-CV-1213-G** |
| | § | |
| **v.** | § | |
| | § | |
| **THE THOMAS KINKADE COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## I. BACKGROUND

1. On June 4, 2004, in response to baseless threats from the Thomas Kinkade Company ("Kinkade") that Kinkade would sue Tuesday Morning in California if Tuesday Morning did not halt a widely advertised sale of Thomas Kinkade prints,

Plaintiffs initiated this lawsuit and filed their Original Complaint against Kinkade. Plaintiffs' Original Complaint sought a declaration from this Court that they had not infringed Kinkade's copyrights and trademark rights.

2. A few hours later, after learning that Plaintiffs had filed this lawsuit in this Court, Kinkade filed its own lawsuit in the United States District Court for the Central District of California (the "California Action"). When the California Action was filed, Tuesday Morning was the only named defendant. Advanced Art was not named in the California Action until several weeks later. Kinkade's California Action is baseless, alleging only a "belief" that the Thomas Kinkade prints were the result of copyright infringement. The true facts are set forth in the Declaration of Douglas Hills, which was originally filed in the California Action in support of Tuesday Morning's Opposition to Kinkade's Application for Temporary Restraining Order. A true and correct copy of the Hills Declaration is attached hereto, marked as **Exhibit "A,"** and is incorporated herein by reference for all purposes as if set forth in full.

3. On June 7, 2004, Advanced Art filed its First Amended Complaint and asserted a claim for tortious interference against Kinkade.

4. Eventually, on June 25, 2004, Kinkade filed its First Amended Complaint in the California Action, finally naming Advanced Art as a defendant.

5. On June 28, 2004, Kinkade filed this Motion to Dismiss (the "Motion") claiming that the well-established "first-to-file" rule does not apply and that this Court should dismiss this lawsuit because Plaintiffs filed it "without first notifying [Kinkade]," because Plaintiffs allegedly lulled Kinkade into postponing the filing of the California Action, and because this lawsuit is allegedly a "classic anticipatory filing."

6. At a hearing on July 12, 2004, the Central District of California denied Tuesday Morning's Motion to Dismiss the California Action.[1]

## II.
## ARGUMENT AND AUTHORITIES

### *A. Kinkade's Motion Must Be Denied Because the "First-to-File" Rule Applies to This Case.*

7. The Court must deny Kinkade's Motion because this lawsuit is the earlier-filed action and must therefore be given priority over the California Action. Kinkade incorrectly argues that this Court must ignore the well-established "first-to-file" rule in favor of various "exceptions." Any narrow exceptions to the "first-to-file" rule do not apply to this case, and the Motion must therefore be denied.

8. The "first-to-file" rule is a by-product of the federal doctrine of comity. The Fifth Circuit explained the "first-to-file" rule as follows:

> The federal courts long have recognized that the principle of comity requires federal courts – courts of coordinate jurisdiction and equal rank – to exercise care to avoid interference with each other's affairs. "As between federal district courts, ... the general principle is to avoid duplicative litigation." The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. To avoid these ills, a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district court.
>
> *West Gulf Mar. Ass'n. v. ILA Deep Sea Local 24, S. Atl. and Gulf Coast Dist. of the ILA*, 751 F.2d 721, 728-29 (5th Cir. 1985) (citations omitted).

[1] In denying Tuesday Morning's Motion to Dismiss the California Action, the Central District of California found that Advanced Art was not a necessary party to the California Action and that Tuesday Morning's (not Advanced Art's) claims in this action were not entitled to deference under the "first-to-file" rule because Tuesday Morning's claims were "anticipatory" in nature. However, that ruling has no effect on Advanced Art because of the finding that Advanced Art was not a necessary party, because Advanced Art had been served with the California Action lawsuit only a few days before that hearing, and because Kinkade did not assert claims against Advanced Art until three weeks after it originally filed the California Action.

Therefore, if this lawsuit and the California Action "overlap on the substantive issues, the cases [should] be ... consolidated in ... the jurisdiction first seized of the issues." *Mann Mfg. Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 n.6 (5th Cir. 1971). "Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) (citing *Save Power* Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 950 (5th Cir. 1997); and *West Gulf*, 751 F.2d at 728).[2]

9. In the *West Gulf* case, the Fifth Circuit cited cases in which several other federal courts have applied the "first-to-file" rule. The only questions in those cases were: (1) whether the suit that a party was seeking to have dismissed was the later-filed suit; and (2) whether the subject-matter of the two suits was sufficiently related to justify dismissal of the later-filed suit. This Court has stated the test in this manner: "(1) are the two pending actions so duplicative that one court should decide the subject matter of both actions; and if so, (2) which of the two courts should take the case?" *Superior Savings Ass'n. v. Bank of Dallas*, 705 F. Supp. 326, 328-29 (N.D. Tex. 1989).

10. In *Washington Metropolitan Area Transit Authority v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980), the court affirmed the dismissal of a second-filed action where the first-filed action presented a "closely related question." In *Bergh v. Washington*, 535 F.2d 505, 506-7 (9th Cir. 1976), the Ninth Circuit affirmed dismissal of

---

[2] The Ninth Circuit, where the California Action is pending, also regularly applies the "first-to-file" rule. As that Court has noted, "The first-to-file rule was developed to 'serve[] the purpose of promoting efficiency well and should not be disregarded lightly.'" *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991) (quoting *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 750 (9th Cir. 1979)). It may be invoked "when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982).

an injunctive action because the same issue was already pending in other litigation. In *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982), the Ninth Circuit affirmed the dismissal of a second-filed action that sought a declaratory judgment of non-infringement of a patent, where a first-filed action in another district sought damages for patent infringement. The Court recognized that the issues in the two actions were identical and that the second-filed lawsuit was properly dismissed. The Court stated: "Normally sound judicial administration would indicate that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action." *Pacesetter at* 678 F.2d at 95.

11. The Fifth Circuit has likewise regularly applied the "first-to-file" rule, allowing the court first "seized" of the controversy to retain the action, and ordering the dismissal of the later-filed action. In *Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971), a patent infringement case, the Fifth Circuit held that the Southern District of New York, where the earlier case was filed, had priority over the Western District of Texas and could therefore decide whether to try all issues relating to both patents in question. *Mann Mfg.*, 439 F.2d at 407-8. In *Electric & Gas Technology, Inc. v. Mazurek*, 2002 WL 1125086 (N.D. Tex. May 28, 2002), this Court recited the history of the "first-to-file" rule in the Fifth Circuit and ultimately deferred to the U.S. District Court for the District of Delaware, where an earlier-filed action (involving the same issues) was pending.

12. In this case, the "first-to-file" rule fully applies: the issues between this action and the California Action are identical, and Plaintiffs legitimately filed this action

in this Court before Kinkade filed the California Action in the Central District of California. First, in this action, Advanced Art has sued Kinkade for tortious interference, and both Plaintiffs have asked the Court for a declaration that they have not infringed Kinkade's copyrights and trademarks. In the California Action, Kinkade sued Tuesday Morning (and, three weeks later, Advanced Art) for infringement of the same copyrights and trademarks. Second, this action is the earlier-filed action, and Kinkade's "anticipatory filing" argument does not undo the applicability of the "first-to-file" rule here. Accordingly, the Motion must be denied, and this action must be permitted to continue in this Court, the proper and most convenient forum for all parties.

### *B. The "Anticipatory Filing" Exception to the "First-to-File" Rule Does Not Apply in This Case.*

13. Kinkade argues that the "first-to-file" rule is inapplicable here because of an "anticipatory filing" exception that has periodically surfaced in Fifth Circuit jurisprudence. The fatal flaw to Kinkade's argument, however, is that in every single one of the "anticipatory filing" cases cited by Kinkade, the ***only*** relief sought in the "first-to-file" action was a declaratory judgment.[3] Moreover, in this Motion, Kinkade does not dispute that whenever the "anticipatory filing" exception applies, it is only because the earlier-filed lawsuit involved nothing more than a request for a declaratory judgment. Kinkade ignores the fact that Advanced Art's First Amended Complaint alleges the substantive cause of action of tortious interference with contracts and business relationships. Plaintiffs' earlier-filed action is therefore not based solely on an

[3] In fact, the elements of the "anticipatory filing" exception make it clear that it will only apply to dismiss an earlier-filed lawsuit for declaratory judgment only: "This Court has stated that a proper factor to consider in dismissing ***a declaratory judgment suit*** is whether the suit was filed in anticipation of another and therefore was being used for the purpose of forum-shopping." *Pacific Employers Ins. Co. v. M/V Capt. W.D. Cargill*, 751 F.2d 801, 804 (5th Cir. 1985) (citing *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 (5th Cir. 1983)) (emphasis added).

application for a declaratory judgment, and the "anticipatory filing" exception therefore does not apply here.

14. Additionally, the "anticipatory filing" exception does not apply here because the policy rationales behind the exception are nonexistent in this case. These policy rationales are: (1) the desire for procedural fairness, and (2) the encouragement of settlement discussions. *See Texas Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994 (E.D. Tex. 1993); and *Columbia Pictures Indus., Inc. v. Schneider*, 435 F. Supp. 742, 747-48 (S.D.N.Y. 1977). In this case, the desire for procedural fairness does not require the dismissal of this action. Plaintiffs brought this action in the only forum that has jurisdiction over all the parties involved, that has any relationship to the matters at issue between the parties, and that is the most convenient forum for all parties pursuant to 28 U.S.C. § 1404(a). Nevertheless, Kinkade argues that this action constitutes impermissible "forum-shopping," while it ignores the fact that the Northern District of Texas is the only proper forum for all the disputes between the parties to be resolved.

15. Similarly, the "settlement discussion" policy behind the "anticipatory filing" exception is nonexistent in this case. Kinkade makes much of its claim that Tuesday Morning agreed not to file any lawsuits without first notifying Kinkade. There was no such agreement among the parties; Plaintiffs willingly participated in settlement discussions and were eventually awarded with Kinkade's all-or-nothing ultimatum that made unreasonable demands upon Plaintiffs. Kinkade refused to consider less drastic means of resolving the disputes among the parties. If any of the parties discouraged further settlement discussions, it was Kinkade. Most importantly, Kinkade does not

even allege that Advanced Art was part of any such alleged "agreement," and Advanced Art was not sued in the California action until three (3) weeks later.

16. Furthermore, Kinkade argues that the "anticipatory filing" exception applies in this case because this action was filed "only a short time before the second-filed action." However, Kinkade did not add Advanced Art to the California Action until three weeks after the California Action was originally filed. Therefore, as to Kinkade's claims against Advanced Art in the California Action, this argument is simply incorrect. As it applies to Advanced Art, the California Action is not entitled to greater deference than this action; Advanced Art was not a party to the California Action until three weeks after Advanced Art sued Kinkade in this action. As to Advanced Art, there was no "difference of just a few hours," and this action should not be dismissed.

***C. In the Alternative, If This Court Is Inclined to Grant the Motion for Any Reason, Plaintiffs Request That a Ruling on the Motion Be Withheld Until the Central District of California Rules on Advanced Art's Motion to Transfer the California Action to This Court.***

17. Advanced Art was not served with the California Action until July 8, 2004, and will contest the jurisdiction of the California court. Moreover, the parties are preparing, and will soon file in the Central District of California, an alternative joint motion to transfer the California Action to this court, pursuant to 28 U.S.C. § 1404(a). The basis of the motion to transfer will be that almost all the factors to be considered under a § 1404(a) analysis weigh in favor of transferring the California Action to this court and consolidating it here. The factors that especially require transfer to this court are the convenience of the witnesses and the parties, ease of access to sources of proof, the parties' contacts with the chosen forum, differences in the costs of litigation,

and the location where the relevant agreements were negotiated, executed, and performed.

18. Accordingly, if this Court has any inclination to grant the Motion in whole or in part, Plaintiffs respectfully request the Court to withhold any ruling on the Motion until the Central District of California rules on the parties' joint motion to transfer.

***D. The Court Must Not Dismiss Advanced Art's Claim for Tortious Interference Because It Properly States a Claim Upon Which Relief Can Be Granted; in the Alternative, If the Court Is Inclined to Dismiss the Claim for Tortious Interference, Advanced Art Would Ask the Court for Leave to Amend Its Complaint.***

19. In its Motion, Kinkade additionally argues that Advanced Art's claim for tortious interference must be dismissed for failure to state a claim. However, the Court must not dismiss Advanced Art's tortious interference claim because Advanced Art must have a fair opportunity to present its claim against Kinkade. *See Schiller v. Physicians Resource Group, Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). A district court may not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *U.S. ex rel. Doe v. Dow Chemical Co.*, 343 F.3d 325, 328 (5th Cir. 2003); *Mills v. Injury Benefits Plan of Schepps-Foremost, Inc.*, 851 F. Supp. 804, 806 (N.D. Tex. 1993). "Under this standard, a court is not permitted to dismiss a complaint simply because it is questionable that the plaintiff will prevail on his claims." *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 926-27 (5th Cir. 1988).

20. The Court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. *See, e.g., Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986). Motions to dismiss are

"disfavored," and "courts will rarely encounter circumstances which justify granting such a motion." *Mahone, 836 F.2d at 927*; *U.S. v. Home Care Services, Inc.*, 1999 WL 222356, *2 (N.D. Tex. 1999); *Blanchard and Co., Inc. v. Heritage Capital Corp.*, 1998 WL 597159, *2-3 (N.D. Tex. 1998). In reviewing a motion to dismiss, a court must bear in mind that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Blanchard and Co., Inc.*, 1998 WL 597159 at *2 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

21. Furthermore, it is undisputed that the Federal Rules of Civil Procedure only require "notice" pleading. *Mahone*, 836 F.2d at 926. Accordingly, only "'a short plain statement of the claim' that will give the defendant fair notice of what the Plaintiffs' claim is and the grounds upon which it rests" is necessary and sufficient. *Id.*; *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990), *clarified on other grounds*, 739 F. Supp. 1087 (N.D. Tex. 1990).

22. Assuming *arguendo* that Advanced Art's claim is deficient, leave to amend is routinely granted to cure deficient allegations. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). The Fifth Circuit has expressly recognized this policy: "But such deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances." *Cates v. International Telephone and Telegraph Corp.*, 756 F.2d 1161, 1180 (5th Cir. 1985). *See also Hart v. Bayer Corp.*, 199 F.3d 239, 247, n. 6 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being

afforded repeated opportunities to do so.") (citing *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 675-76 (2nd Cir. 1991)).

23. If the Court finds that the Motion should be granted, Advanced Art would ask the Court for leave to amend its Complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely granted when justice so requires." Fed. R. Civ. P. 15(a). Rule 15(a) "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). "In sum, the district court must have a 'substantial reason' to deny a request for leave to amend." *Herrmann Holdings Ltd. v. Lucent Technologies Inc.*, 302 F.3d 552, 566 (5th Cir. 2002) (quoting *Dussouy*, 660 F.2d at 598).

24. In *U.S. ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375 (5th Cir. 2003), the Fifth Circuit stated the following:

> "The liberal amendment policy underlying Rule 15(a) affords the court broad discretion in granting leave to amend and, consequently, a motion for leave to amend should not be denied unless there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment.'"
>
> *U.S. ex rel. Willard*, 336 F.3d at 386 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

25. Kinkade claims that Advanced Art's claim for tortious interference fails to state a claim because Advanced Art "does not allege the existence of any other relationship or a reasonable probability of any other relationship between them," and "does not allege that Tuesday Morning breached any contract or that their relationship (or prospective relationship) otherwise was disrupted." Kinkade's claims could not be any more incorrect. In paragraph 31 of the First Amended Complaint, Advanced Art

states that it has "contracts and relationships with Tuesday Morning." Also in paragraph 31, Advanced Art alleges that Kinkade, "by its conduct described above, acted willfully and intentionally, without just cause or excuse, in a way which interfered with such business relations." Then, in paragraph 32, Advanced Art alleges that it "has been damaged" by Kinkade's actions, and in paragraph 33 it alleges that Kinkade "has intentionally interfered with Advanced Art's ability to run its business, in bad faith, and with no legal justification."

26. Accordingly, Advanced Art has met the notice pleading requirements as to its claim for tortious interference, and the Motion must be denied on this ground. In the alternative, if this Court is inclined to dismiss Advanced Art's claim for tortious interference for failure to state a claim, Advanced Art would respectfully ask the Court for leave to amend its Complaint.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Mill Creek Press, Inc. d/b/a Advanced Art and Tuesday Morning Corporation respectfully request that this Court: (1) deny Defendant The Thomas Kinkade Company's Motion to Dismiss; (2) in the alternative, if the Court is inclined to grant the Motion to Dismiss on the ground that the "first-to-file" rule does not apply, withhold its ruling thereon until the Central District of California rules on the parties joint motion to transfer; (3) in the alternative, if the Court is inclined to grant the Motion to Dismiss on the ground that Advanced Art's claim for tortious interference fails to state a claim, grant Advanced Art leave to amend its Complaint; and (4) grant Plaintiffs all other relief, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

By: ______________________________
**Lawrence J. Friedman**
State Bar No. 07469300
**James Robert Krause**
State Bar No. 11714525
**Del W. Mecham, Jr.**
State Bar No. 24037085

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

**ATTORNEYS FOR PLAINTIFF MILL CREEK PRESS, INC. d/b/a ADVANCED ART**

**FULBRIGHT & JAWORSKI, L.L.P.**

By: ______________________________
**Robert M. Chiaviello, Jr.**
State Bar No. 04190720
**Brett C. Govett**
State Bar No. 08235900

2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 855-8000 (Telephone)
(214) 855-8200 (Facsimile)

**ATTORNEYS FOR PLAINTIFF TUESDAY MORNING CORPORATION**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of July, 2004, a true and correct copy of the foregoing document was served upon all counsel of record according to the Federal Rules of Civil Procedure.

Robert M. Chiaviello, Jr.

JOHN O'MALLEY (CALIFORNIA STATE BAR NO. 101181)
ALEXANDER M. MEDINA (CALIFORNIA STATE BAR NO. 222015)
**FULBRIGHT & JAWORSKI L.L.P.**
865 South Figueroa Street, 29th Floor
Los Angeles, California 90017
Telephone: (213) 892-9200
Facsimile: (213) 680-4518

ROBERT M. CHIAVIELLO, JR. (TEXAS STATE BAR NO. 04190720)
BRETT GOVETT (TEXAS STATE BAR NO. 08235900)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Attorneys for Defendant
TUESDAY MORNING CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THOMAS KINKADE COMPANY, F/K/A MEDIA ARTS GROUP, INC., a Delaware corporation,

Plaintiffs,

vs.

TUESDAY MORNING CORPORATION, a Delaware corporation; AND DOES 1-10,

Defendant.

NO. CV04-4015 RSWL (MANX)

**DECLARATION OF DOUGLAS HILLS IN SUPPORT OF DEFENDANT TUESDAY MORNING'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**



EXHIBIT "A"

DECLARATION OF DOUGLAS HILLS

I, Douglas Hills, declare:

1. My name is Douglas Hills, and I am a resident of the State of Texas. I am the President of Mill Creek Press, Inc. d/b/a Advanced Art ("Advanced Art") which has its only place of business in Dallas, Texas. I have held the position of President of Advanced Art since June 2002 until the present. The matters stated herein are known to me personally, and upon a review of the business records of Advanced Art, they are all true and correct. If called to testify, I could and would competently testify thereto.

2. I have worked for Advanced Art in sales and marketing since 1996. In that capacity I am familiar with the negotiations, transactions, and documents related to the transactions described herein.

3. During the summer of 2001, I was advised by representatives of a company called RedTag Biz, Inc. ("RedTag Biz"), that Media Arts Group ("Media Arts") had formulated a plan to liquidate their excess inventory of open edition lithograph reproductions of Thomas Kinkade prints (the "Kinkade Prints"). Media Arts sold a portion of this inventory, without limitation and without any restrictions on the further sale of the inventory, to RedTag Biz.

4. In August of 2001, RedTag Biz approached Advanced Art about purchasing the Kinkade Prints and other products that RedTag Biz had acquired from Media Arts.

5. On August 27, 2001, and again on November 25, 2001, Advanced Art issued purchase orders to RedTag Biz for the Kinkade Prints. Advanced Art purchased and received no less than three shipments of Kinkade Prints from RedTag Biz. These shipments were received on October 1, 2001, October 14, 2001, and December 7, 2001. Advanced Art purchased and received a total of 52,224 Kinkade Prints from RedTag Biz in these three shipments.

6. On or about November 29, 2001, Advanced Art wired $200,000.00 to RedTag Biz as payment for a portion of the Kinkade Prints and other Kinkade products. On or about November 30, 2001, Advanced Art wired an additional $563,000.00 to RedTag Biz as payment for the Kinkade Prints. On February 25, 2002, Advanced Art wired an additional $169,000.00 to RedTag Biz as final payment for the Kinkade Prints.

7. In November and December of 2001, Media Arts' senior representatives Steve Giodano and Brian Higginson encouraged Advanced Art to purchase RedTag Biz's remaining inventory of the Kinkade Prints prior to the end of 2001. At that time, Advanced Art declined to purchase additional prints.

8. Later, when Steve Giodano and Brent Higginson had left the employment of Media Arts, they acknowledged to me that the prior inventory liquidation sales to Tuesday Morning and Hobby Lobby caused an uproar amongst some of Media Arts' dealer network.

9 All of Advanced Art's purchases from RedTag Biz were made with the knowledge and consent of Media Arts, and there were no limitations or restrictions on the further sale of the inventory.

10. Advanced Art also received and paid for not less than 17,002 Kinkade prints directly from Media Arts in the spring and summer of 2002. On February 13, 2002, Media Arts shipped 7 Kinkade prints to Advanced Art and a separate shipment of 99 Kinkade Prints was also shipped to Advanced Art on that date. On February 14, 2002, Media Arts shipped an additional 109 Kinkade Prints to Advanced Art. On February 14, 2002, Media Arts shipped an additional 27 Kinkade Prints to Advanced Art. On March 28, 2002, Media Arts shipped an additional 3,943 Kinkade Prints to Advanced Art. On July 31, 2002, Media Arts shipped 11,993 Kinkade Prints to Advanced Art. On September 6, 2002, Media Arts shipped to Advanced Art 3 shipments of Kinkade Prints in the amounts of 7,425, and 392. There were no limitations or restrictions on the further sale of these 17,002 prints.

11. In the purchases listed above, Advanced Art paid for and received a total of 70,942 Kinkade Prints. Advanced Art did not print any of the 70,942 Kinkade Prints. Advanced Art has never possessed any digital files of Kinkade artwork. Advanced Art obtained all of the 70,942 Kinkade Prints from RedTag Biz or Media Arts and was informed by RedTag Biz and Media Arts that all of the Kinkade Prints were legitimate and authorized copies of the original prints.

12. Of these 70,942 prints, Advanced Art sold 17,584 items to Hobby Lobby on January 31, 2002 and on October 16, 2002. Advanced Art sold 26,926 of the Kinkade Prints to Tuesday Morning in shipments dated November 29, 2001, December 11, 2001, and December 28, 2001. After these shipments, Advanced Art stilled retained more than 26,000 of the Kinkade Prints in its possession.

13. In March of 2004, Advanced Art agreed to a second sale of Kinkade Prints to Tuesday Morning from the remaining inventory of Kinkade Prints Advanced Art had purchased from Media Arts and from RedTag Biz. Advanced Art then shipped to Tuesday Morning 22,436 of the remaining 26,000 Kinkade Prints in Advanced Art's inventory. Advanced Art continues to hold additional Kinkade Prints in its possession.

14. Premium framed, double matted, open edition Thomas Kinkade lithographs of the size and quality sold by Advanced Art to Tuesday Morning have sold at retail for $700-$850.

15. Advanced Art has never possessed any digital files of Kinkade artwork. During Advanced Art's performance of its obligations pursuant to the Home Interiors Manufacturing Agreement referenced in the declarations filed by The Kinkade Company, Media Arts sent the digital files directly to a number of printers, who then printed the images.

16. Advanced Art paid for the printing, and was required to use Media Arts' approved printers with Media Arts' authorization. This same procedure was

followed in the Distribution Agreement with Hobby Lobby that is referenced in the Thomas Kinkade Company declarations. Advanced Art will obtain records showing the number of prints prepared by these approved printers, and Advanced Art can account for all of these Kinkade prints, which were either delivered to Home Interiors or remain at Advanced Art pursuant to Advanced Art's obligations in the Manufacturing Agreement. The pictures printed for the Home Interiors transaction are a small size image (16 x 20 inches) that was utilized specially for that distribution. None of the Kinkade Prints delivered to Tuesday Morning in the recent March 2004 transaction are 16 x 20. Advanced Art can also verify, by obtaining records from the printers Media Arts approved, that all of the prints for the Hobby Lobby Distribution Agreement were sold to Hobby Lobby. A very limited amount remain segregated at Advanced Art's offices.

17. The Kinkade declarations refer to the conclusion of the Manufacturing Agreement between Media Arts and Advanced Art. The prints sold to Tuesday Morning were not manufactured as part of the Manufacturing Agreement, nor were they manufactured as part of the Hobby Lobby Distribution Agreement.

18. Advanced Art disputes that the Manufacturing Agreement between Media Arts and Advanced Art was legally terminated and has filed a lawsuit in the 116th District Court of Dallas County, Texas, (Cause No. 04-01021-F) against Media Arts and Home Interiors. However, the District Court Judge abated the case and has ordered that the entire case proceed to arbitration. Attached hereto as

Exhibit A is a true and correct copy of the Petition for Cause No. 04-01021-F. Attached hereto as Exhibit B is a true and correct copy of the proposed Order to Arbitrate in that action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of June, 2004.

Douglas Hills

# PROOF OF SERVICE

I, Linda Civitello, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 865 South Figueroa Street, 29th Floor, Los Angeles, California 90017. On June 7, 2004, I served a copy of the within document(s):

**DECLARATION OF DOUGLAS HILLS. IN SUPPORT OF DEFENDANT TUESDAY MORNING'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

X by transmitting electronically the document(s) listed above to the email address(es) set forth below on this date before 5:00 p.m.

by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

by placing the document(s) listed above in a sealed __________ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a __________ agent for delivery.

Dana N. Levitt
dlevitt@agsk.com

Jonathan R. Goldblatt
JGoldblatt@agsk.com
Alshuler Grossman Stein & Kahan LLP
The Water Garden
1620 26th Street
Fourth Floor, North Tower
Santa Monica, CA 90404-4060

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on

motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on June 7, 2004, at Los Angeles, California.

Linda Civitello



CAUSE NO. 04-01621-F

| MILL CREEK PRESS, INC. d/b/a ADVANCED ART, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| Plaintiff, | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| MEDIA ARTS GROUP, INC. AND HOME INTERIORS & GIFTS, INC., | § | |
| Defendants. | § | ______ JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW** Mill Creek Press, Inc. d/b/a Advanced Art ("Advanced Art" or "Plaintiff") and files this its Original Petition, complaining of and against Media Arts Group, Inc. and Home Interiors & Gifts, Inc. (collectively, the "Defendants") and, in support thereof, would respectfully show unto the Court as follows:

## I. DISCOVERY CONTROL PLAN

1. This matter is subject to Discovery Level 3 in accordance with the Texas Rules of Civil Procedure.

## II. PARTIES

2. Plaintiff is a Texas corporation doing business in Texas.

3. Defendant Media Arts Group, Inc. ("Media Arts") is a Delaware corporation doing business in the State of Texas. Media Arts does not maintain a registered agent in the State of Texas, and it may therefore be served with process by serving Herb Montgomery, its Chief Financial Officer, by certified mail, at 900 Lightpost Way, Morgan Hill, California 95037-2869.

EXHIBIT A

4. Defendant Home Interiors & Gifts, Inc. ("Home Interiors") is a corporation organized under the laws of the State of Texas and may be served with process by serving its registered agent for service of process, the CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

## III.
## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court as the damages fall within the jurisdictional limits of this Court.

6. Venue is proper in Dallas County as this county is where the offices of the Plaintiff are located, and because the acts or omissions giving rise to Plaintiff's claims arose, in whole or substantial part, in Dallas County, Texas.

## IV.
## BASIS OF SUIT

7. The Defendants have made fraudulent statements that induced Plaintiff to act in connection with commercial transactions between the parties. The Plaintiff sues the Defendants for fraud and constructive fraud, conspiracy, breach of contract, declaratory judgment, negligent misrepresentation, quantum meruit, unjust enrichment, attorneys' fees, and for a constructive trust and accounting.

8. Plaintiff seeks damages against the Defendants, and further seeks a declaratory judgment as to the rights and obligations of the parties pursuant to the agreements between the parties described below.

## V.
## BACKGROUND FACTS

9. Mill Creek Press, Inc. d/b/a Advanced Art ("Advanced Art") is in the business of printing, reproducing, manufacturing, framing and shipping art products.

10. Media Arts Group, Inc. ("Media Arts") is in the business of reproducing and publishing art prints by Thomas Kinkade and other products for retail sales through authorized dealers.

**Media Arts Breaches a $3,996,281.00 Agreement with Tuesday Morning and Breaches a Valuable Agreement with J.C. Penney**

11. In or about mid-year 2001, Advanced Art purchased 30,000 plus pieces of signed and numbered pieces of art from a broker who works closely with Media Arts. In September, 2001, Advanced Art sold more than 28,000 of the art pieces to Tuesday Morning.

12. Media Arts then contacted Advanced Art and urged Advanced Art to purchase the entire inventory of prints. According to Media Arts, it needed to book the sale by the end of that year on December 31, 2001. Advanced Art declined to purchase the entire inventory, but continued its analysis of the terms by which it would purchase additional prints. Advanced Art then contacted Tuesday Morning to determine if it was interested in additional prints. Advanced Art negotiated terms for a pending sale to Tuesday Morning, and proceeded to negotiate terms with Media Arts. On December 18, 2001, Advanced Art and a Media Arts representative, Brent Higginson, met with Tuesday Morning to finalize the transaction. Media Arts acknowledged approval for a second deal to Tuesday Morning. Tuesday Morning then issued a Purchase Order for $3,553,883.00 worth of product to be shipped on March 1, 2002.

13. Advanced Art was also asked by Media Arts to sell inventory of 3D Thomas Kinkade inventory to Tuesday Morning. Advanced Art then secured an order from Tuesday Morning for an additional $442,398.00 worth of 3D product. Media Arts agreed to this transaction.

14. Also in December 2001, Steve Giordano and Brent Higginson gave Media Art's approval to present product to J.C. Penney. J.C. Penney was very excited about the project, and Advanced Art obtained approvals for the deal from Media Arts.

15. Then began a disturbing pattern of behavior by Media Arts. In January 2002, Media Arts threatened to cancel the Tuesday Morning deal if Tuesday Morning would not agree to raise the retail prices on the framed art pieces. Such a request was not only illegal, but it was also contrary to the terms of the existing, binding agreement among Media Arts, Advanced Art and Tuesday Morning. Tuesday Morning declined to raise its retail prices, and stated, accurately, that it had a deal that was confirmed by Media Arts during the December 18, 2001 meeting.

16. Media Arts followed through on its threats and refused to honor the Tuesday Morning deal and ship prints to Advanced Art to fulfill the purchase order. As a consequence, Advanced Art lost two purchase orders from Tuesday Morning, worth $3,996,281.00. Advanced Art now sues for the damages caused by Media Arts' breach of contract, bad faith and illegal conduct.

17. Even after Media Arts breached the Tuesday Morning deal, however, Media Arts asked Advanced Art to continue with the J.C. Penney arrangement. Advanced Art learned that Ken Rausch, the former CEO of Media Arts and now the CEO of Creative Brands Group had expressed concern that Advanced Art would be selling the art to J.C. Penney in a manner that would not benefit him with any fee or commission from Media Arts. Nevertheless, Advanced Art is told by Steve Giordano, the former Vice President for Sales at Media Arts, that Advanced Art should proceed with the J.C. Penney deal. Advanced Art then proceeded with the deal and incurred substantial expenses in preparing to fulfill the J.C. Penney's contract.

18. Media Arts then reneged on the J.C. Penney deal causing damages to Advanced Art. Advanced Art believes that Media Arts was motivated solely by the desire of Media Arts' officers to obtain personal benefit on a J.C. Penney transaction structured differently than the Advanced Art agreement with J.C. Penney. Advanced Art now sues for the damages caused by Media Arts' breach of contract, bad faith and illegal conduct in connection with the J.C. Penney transaction.

**Home Interiors & Gifts, Inc.**

19. Media Arts then sought to delay any legal action by Advanced Art related to the lost Tuesday Morning deal by promising an extended, five-year agreement with Advanced Art to sell art to Home Interiors & Gifts, Inc. ("Home Interiors").

20. In October 2001, Advanced Art had begun discussions with Media Arts regarding an additional business deal. Advanced Art received permission from Steve Giordano, the Media Arts designated contact person, to pursue this deal. Advanced Art was initially told that Media Arts would accept $2.73 per piece. Advanced Art subsequently agreed on a fee of $5.00 per picture after Media Arts demanded more.

21. Advanced Art then solicited interest from Home Interiors for a five-year, tri-party relationship. Media Arts did not have a business relationship with Home Interiors prior to Advanced Art's negotiation of this relationship. Advanced Art had a 30-year relationship with Home Interiors. On or about November 14, 2001, Advanced Art approached Home Interiors to manufacture and sell works of Thomas Kinkade with Media Arts' approval. Advanced Art proposed a series of 12 "Library Series" prints. These negotiations between Advanced Art and Home Interiors continued, and an agreement was outlined.

22. On December 18, 2001, Advanced Art representatives and the Media Arts representative, Brent Higginson, met with Home Interiors to solidify the deal. Media Arts verbally agreed to the three-way deal, with Advanced Art acting as Media Arts' agent with respect to Home Interiors. The parties signed a Letter of Intent for a five-year relationship on or about January 8, 2002, with the goal of having a completed agreement within 30 days of January 8, 2002.

**Media Arts, Advanced Art, and Home Interiors Begin Performance of the Five-Year Deal**

23. Even though Media Arts caused the negotiations of the definitive agreement to drag on needlessly, the parties almost immediately began performing the agreed upon terms of the five-year contract set forth in the Letter of Intent. The agreement always required Home Interiors to purchase a minimum of 12 prints. Media Arts agreed to have Thomas Kinkade film a brief introduction for the new product line. Advanced Art delivered the tape and three signed samples of Kinkade works to Home Interiors. Home Interiors announced the product launch at the Displayer seminar on January 9-21, 2002, in Orlando, Florida. This was done with Media Arts' approval and cooperation. Home Interiors announced to Advanced Art that it intended to order approximately 100,000 pieces of the first two images.

24. Mike Lohner, the CEO of Home Interiors, became impatient with Media Arts' delays in finalizing the definitive agreement. Lohner then began negotiations with Advanced Art to speed up the process so that Home Interiors could launch the new "Kinkade" art as part of its new product offering in the Spring of 2002. On or about February 8, 2002, Mike Lohner visited Advanced Art for a lunch meeting and factory tour. At this meeting, Lohner expressed his intention to build the pictures at Home

Interiors and deal directly with Media Arts. Lohner expressed his desire to have a direct arrangement with Media Arts and to cut Advanced Art out of the arrangement.

25. In the meantime, Media Arts demanded a change to the deal with Advanced Art and requested $10.00 per picture. Advanced Art reluctantly agreed in order to rapidly finalize the transaction.

26. On or about February 11, 2002, Home Interiors gave Advanced Art the first purchase orders for orders on the first two prints. These shipments were to take place up to May 31, 2002. Advanced Art shipped the orders on time with no problems. Advanced Art paid Media Arts the agreed upon $10.00 per picture.

27. Even after the first purchase order to Advanced Art, Media Arts delayed signing the definitive agreement by creating disagreement on certain terms. Mike Lohner then had direct contact with Steve Giordano and other Media Arts representatives. Lohner expressed frustration to Advanced Art about the manner in which Media Arts was handling the agreement. Steve Giordano of Media Arts then asked Advanced Art to draft a proposal that would work for all three parties. In April 2002, Advanced Art sent a draft agreement to Steve Giordano at Media Arts, who had the agreement reviewed by Media Arts' senior management.

28. On or about April 14, 2002, Home Interiors issued a second set of purchase orders to Advanced Art for the second set of two prints.

**Media Arts Schemes to Diminish Advanced Art's Role**

29. Incredibly, on or about April 26, 2002, Steve Giordano wrote a letter implying that Media Arts had no deal with Advanced Art or Home Interiors. This letter caused great concern and shock to Advanced Art and to Home Interiors who, like Media Arts, were already performing the agreement. Media Arts then demanded that the

parties restructure the deal to have Media Arts book the sales in order to improve public perception of Media Arts' performance for the public, including stockholders and stock analysts. Media Arts also demanded Advanced Art agree to take less money. Media Arts also demanded that Home Interiors pay more, pay upfront money and secure the purchase orders with letters of credit. After continuing negotiations over the prices, on or about May 17, 2002, Media Arts finally agreed to pay Advanced Art $32 per picture to produce the art work. However, Media Arts would only continue with the deal if Advanced Art agreed to take a secondary role by allowing Media Arts to book the sale and have Home Interiors now become Media Arts' customer. Media Arts also stacked the written documents with limitations of liability and limitations upon the term of the relationship. Advanced Art had no choice but to accept these changes because of Media Arts' and Home Interiors' threats to cut Advanced Art out of the relationship. The final drafts of the agreements were for an 18 month term. Advanced Art questioned the 18 month term because it had proceeded to perform based upon promises of a five-year term. But Advanced Art was assured by Steve Giordano that the contracts would be renewed and the minimum number of 12 prints would be manufactured by Advanced Art.

30. On or about July 31, 2002, the parties signed a Manufacturing Agreement and a Dealer Agreement.

**Media Arts and Home Interiors Execute Their Scheme to Remove Advanced Art from the Relationship**

31. From July 2002 to January 2003, the parties proceeded with the contract with little difficulty. Then, in January 2003, Media Arts again reneged on promised deals that were not related to the Home Interiors project.

32. In January 2003, Media Arts attempted to renege on an order for 56,000 pieces of open edition paper at $20.00 per unit. Media Arts had previously agreed, in September 2002, to sell the art at this price. Advanced Art subsequently received purchase orders from its customers to sell these framed prints. There was a meeting held at the Media Arts head office to discuss an agreement with Hobby Lobby to sell 56,000 pieces of art. At that meeting, Media Arts' CFO, Herb Montgomery, threatened to retaliate against Advanced Art for requiring an escrow account to be set up for the Home Interiors deal. Montgomery appears to have backed off of the threat. Nevertheless, Montgomery insisted that Advanced Art approach Hobby Lobby and inform them that they had to raise their retail prices. Advanced Art strongly objected and notified Montgomery that Media Arts' conduct was illegal and a form of price fixing.

33. Media Arts then began to freeze Advanced Art out of all discussions with Home Interiors. By the fall of 2003, Home Interiors and Media Arts began to avoid communications with Advanced Art and routinely provided evasive information to Advanced Art regarding the remaining orders required by the Manufacturing Agreement and the Dealer Agreement. It is now clear that both Home Interiors and Media Arts sought to delay the production of the last four art pieces required by the contracts until after the stated term of the agreements. Finally, on January 29, 2004, Todd Stewardson of Media Arts advised Advanced Art that Media Arts would not honor the remaining obligations under the Manufacturing Agreement and the Dealer Agreement.

34. Advanced Art is a third-party beneficiary of the Dealer Agreement between Media Arts and Home Interiors.

35. It is now clear that Home Interiors and Media Arts never intended to honor the terms of the Letter of Intent and the relationship set forth in the Manufacturing

Agreement and the Dealer Agreement. After Advanced Art established the relationship and convinced the parties of the benefits of the relationship, Media Arts and Home Interiors plotted to eliminate Advanced Art from the relationship, first, by cutting out Advanced Art's profits on the deal, even after the production had begun, and, second, by drastically cutting back on the term of the relationship. Media Arts fraudulently represented to Advanced Art that the cut in the term set forth in the Manufacturing Agreement and the Dealer Agreement would not limit the term of the overall relationship, and Advanced Art relied upon this representation in signing the agreements.

36. In addition to suing for the four remaining pieces that Home Interiors is required to purchase under the Dealer Agreement, Advanced Art is suing for the costs of materials it has procured to complete its performance under the Manufacturing Agreement and the Dealer Agreement. In addition, Advanced Art is suing for damages caused by Media Arts' and Home Interiors' fraudulent inducement to perform the five-year relationship that both Media Arts and Home Interiors never intended to honor.

37. Lastly, Advanced Art is suing Media Arts for the damages caused by the loss of the Tuesday Morning contract and the loss of the January 2003 contract to sell 56,000 art pieces.

## VI.
## CLAIMS

**Count One: Breach of Contract**

38. Plaintiff incorporates and re-alleges the allegations set forth above.

39. Media Arts entered into an agreement with Plaintiff for the sale of art to Tuesday Morning. Media Arts breached this agreement.

40. Both Defendants entered into written agreements and a series of oral partnership and/or joint venture agreements with the Plaintiff related to the sale of the art. Incorporated into these agreements is the duty of good faith and fair dealing. The Defendants have failed to honor and abide by the explicit and implied terms of the agreements.

41. Advanced Art is an intended, third-party beneficiary of the Dealer Agreement between Media Arts and Home Interiors. Media Arts and Home Interiors intended to secure a benefit to Advanced Art by signing the Dealer Agreement, in conjunction with the Manufacturing Agreement, and Home Interiors and Media Arts entered into the contract directly for the third party's benefit.

42. The Defendants have proximately caused actual damages to the Plaintiff in excess of the jurisdictional limits of this Court for which it now sues. The Plaintiff has also incurred attorneys' fees and costs as a result of the conduct of the Defendants for which Plaintiff sues the Defendants.

43. As a further result of the breach of contract by the Defendants, the Plaintiff has suffered consequential damages in an amount in excess of the jurisdictional limits of this Court for which it now sues.

**Count Two: Tortious Interference with Existing and Prospective Business Relationships and Contracts**

44. Plaintiff incorporates and re-alleges the allegations set forth above.

45. Plaintiff has contracts and relationships with others. The Defendants, by their conduct described above, acted willfully and intentionally, without just cause or excuse, in a way which interfered with such business relations. Further, the Defendants' conduct failed to comport with the standards of fair play.

46. As a result of the Defendants' tortious interference, the Plaintiff's ability to uphold its contractual obligations has been seriously impaired. Accordingly, the Plaintiff requests that this Court enter judgment against the Defendants for the amount of its actual damages, consequential, and special damages, including lost profits, in an amount within the jurisdictional limits of this Court.

47. By their actions, the Defendants have intentionally interfered with the Plaintiff's ability to run its business, in bad faith, and with no legal justification. As a result of the Defendants' willful and deceitful actions, Plaintiff seeks recovery of exemplary damages.

**Count Three: Fraud and Constructive Fraud**

48. Plaintiff incorporates and re-alleges the allegations set forth above.

49. The Defendants' actions, as described above, constitute fraud. Specifically, and without limitation, the Plaintiff would not have provided valuable benefits to either Media Arts or to Home Interiors and contributed time, money and effort to the venture had it not been for the Defendants' material misrepresentations of fact or the failure of the Defendants to state material facts necessary to make their statements not misleading. The Defendants willfully defrauded the Plaintiff by knowingly misrepresenting material facts or by recklessly representing material facts without knowledge of the truth and as a positive assertion, with the intention of inducing the Plaintiff to contribute time, money and effort to the venture. Alternatively, the Defendants concealed material facts or failed to disclose material facts, which they knew would cause the Plaintiff not to contribute time, money and effort to the venture. Alternatively, the Defendants made statements of opinion based upon false statements

of fact, or the opinions were known to be false when made. Alternatively, the Defendants' actions constitute constructive fraud.

50. As a result of the Defendants' fraud, the Plaintiff has suffered actual and consequential damages in an amount in excess of the minimal jurisdictional limits of this Court. As a result of the Defendants' willful and deceitful actions, Plaintiff seeks recovery of exemplary damages.

**Count Four: Conspiracy**

51. Plaintiff incorporates and re-alleges the allegations set forth above.

52. Each of the Defendants has aided, abetted, solicited, and benefited from the others' wrongful conduct, including their breach of fiduciary duties. The actions of the Defendants complained of herein, which were aided and abetted by the remaining Defendants, were a producing and/or proximate cause of harm to the Plaintiff and have resulted in damages in an amount in excess of the minimum jurisdictional limits of this Court for which sums the Plaintiff now sues the Defendants. As a result of the Defendants' willful and deceitful actions, Plaintiff seeks recovery of exemplary damages.

**Count Five: Declaratory Judgment**

53. Plaintiff incorporates and re-alleges the allegations set forth above.

54. Plaintiff requests that this Court make a declaration of the rights and obligations of the parties to the agreements referenced in this lawsuit and to declare, inter alia, that the Defendants breached the terms of the agreements with the Plaintiff, and that the Defendants are liable to the Plaintiff for damages.

55. Plaintiff further requests that this Court interpret the terms of the agreements, which are ambiguous.

56. Plaintiff asserts that an award of reasonable and necessary attorneys' fees to Plaintiff would be equitable and just and, therefore, is authorized by §37.009 of the Tex. Civ. Prac. & Rem. Code. Plaintiff now sues the Defendants for its reasonable and necessary attorneys' fees and expenses of litigation for this action and any appeal to an intermediate court or the Texas Supreme Court, as authorized by § 37.009 of the Tex. Civ. Prac. & Rem. Code.

**Count Six: Breach of Fiduciary Duty**

57. Plaintiff incorporates and re-alleges the allegations set forth above.

58. Plaintiff will show that the Defendants misrepresented the matters described above in a transaction in which the Defendants had a pecuniary interest and in which the Defendants owed fiduciary duties to the Plaintiff. Plaintiff would show that the parties entered into a joint venture or partnership by estoppel, and the acts and actions of the Defendants, as described above, constitute a breach of the fiduciary duties that they owed to Plaintiff.

59. The aforesaid acts were malicious.

60. As a consequence, the Defendants are liable to Plaintiff for the damages caused to the Plaintiff. Plaintiff hereby sues the Defendants for all such damages, including punitive damages and attorneys' fees.

**Count Seven: Negligent Misrepresentation**

61. Plaintiff incorporates and re-alleges the allegations set forth above.

62. In the alternative and without waiver of the foregoing allegations, Plaintiff will show that the Defendants negligently misrepresented the matters described above. The Defendants provided the false information for the guidance of Plaintiff in their business, and the Defendants did not exercise reasonable care or competence in

obtaining or communicating the information to Plaintiff. Plaintiff suffered pecuniary loss by justifiably relying on the representations of the Defendants.

63. These actions and misrepresentations of the Defendants have proximately caused actual, consequential and special damages to Plaintiff in an amount in excess of the jurisdictional limits of this Court, for which Plaintiff now sues the Defendants.

**Count Eight: Quantum Meruit**

64. Plaintiff incorporates and re-alleges the allegations set forth above.

65. Pleading in the alternative and without waiver of the foregoing claims and allegations, Plaintiff would show that the Defendants obtained the benefit of the services of the Plaintiff and services and materials from Plaintiff. As a direct result of these services, a benefit was conferred upon the Defendants. The Defendants knew of the actions of the Plaintiff in providing these services and consented and accepted the benefit of these services. The Defendants have not paid for the services.

66. As a result of the Defendants' non-payment, the Plaintiff has been damaged and are entitled to recover the reasonable value of the services provided to the Defendants. The Plaintiff has been forced to hire counsel to pursue this claim, and request judgment from the Court for their reasonable and necessary attorneys' fees incurred in this action.

**Count Nine: Unjust Enrichment**

67. Plaintiff incorporates and re-alleges the allegations set forth above.

68. Pleading in the alternative and without waiver of the foregoing claims and allegations, Plaintiff would show that the Defendants obtained the benefit of the services from the Plaintiff. As a direct result of these services, a benefit was conferred upon the Defendants. The Defendants will be unjustly enriched in the amount claimed by the

Plaintiff if allowed to retain the benefit conferred on Defendants without payment for the reasonable value of the services provided by the Plaintiff to the Defendants described above.

69. As a result of Defendants' non-payment, the Plaintiff has been damaged and is entitled to recover the reasonable value of the services provided to the Defendants. The Plaintiff has been forced to hire counsel to pursue this claim, and requests judgment from the Court for his reasonable and necessary attorneys' fees incurred in this action.

**Count Ten: Attorneys' Fees**

70. Plaintiff incorporates and re-alleges the allegations set forth above.

71. As a result of the actions of Defendants, it was necessary for Plaintiff to employ the services of the undersigned counsel to conduct this litigation. Plaintiff is entitled to recovery of a sum equal to all reasonable attorneys' fees and costs of court incurred in prosecuting this lawsuit, as well as all post-judgment proceedings and appellate proceedings, pursuant to the agreements and Chapter 38 of the Texas Civil Practice and Remedies Code.

**Count Eleven: Constructive Trust, Receiver and Accounting**

72. Plaintiff incorporates and re-alleges the allegations set forth above.

73. Plaintiff requests that this Court impose a constructive trust and accounting on all of the accounts in the possession, control and custody of Defendants, and the proceeds thereof. Plaintiff further requests this Court order Defendants, as constructive trustees, to make an accounting of all such accounts. Plaintiff further requests that the Court appoint a receiver.

**Count Twelve: Request for Equitable Relief of Rescission or Partial Rescission**

74. Plaintiff incorporates and re-alleges the allegations set forth above.

75. Pleading in the alternative, and without waiver of the remaining and other claims and allegations set forth in this Petition, the Plaintiff states that the Defendants' actions, as described above, constitute fraud. Plaintiff is willing and able to restore all consideration received under the contract to Defendants. Plaintiff had no knowledge that Defendants' representations were false until recently. Rescission or partial rescission is justified by the fraudulent acts of the Defendants, and by the Defendants' acts constituting economic duress, constructive fraud, and breach of fiduciary duty.

76. Plaintiff will suffer substantial harm if the written contracts are not rescinded and the parties are not restored to their oral agreement for a five-year relationship. Alternatively, the Plaintiff requests partial rescission: the terms that limit the term of the relationship and limit the damages that can be sought by Plaintiff should be rescinded, as those terms were procured by false promises and fraudulent conduct. Accordingly, the Plaintiff requests an equitable decree of rescission of the written contracts which were procured by fraud, and a return to the oral agreements that were partially performed by the parties before the written agreements were signed.

**Count Thirteen: Exemplary Damages**

77. Plaintiff incorporates and re-alleges the allegations set forth above.

78. Pursuant to statute and the common law, Plaintiff seeks an amount of exemplary damages of three times its actual damages, which is necessary to punish Defendants and deter similar conduct by Defendants in the future.

**Count Fourteen: Equitable Estoppel**

79. Plaintiff incorporates and re-alleges the allegations set forth above.

80. The Defendants defrauded the Plaintiff by obtaining their valuable services and confidential client information with the intention of cutting off the agreed-upon financial benefits to the Plaintiff. Defendants concealed this intention and made false representations of material facts, with the actual or constructive knowledge of the truth. Plaintiff had no knowledge of the truth and no reasonable means of determining the truth. The Defendants acted with the intention that the concealment and false representations be acted upon, and the Plaintiff detrimentally relied upon concealment and false representations.

81. Defendants should be estopped to rely upon the terms of the Dealer Agreement and Manufacturing Agreement, or alternatively, estopped to rely upon the terms that limit the term of the relationship and limit the damages that can be sought by Plaintiff, as those terms were procured by fraudulent conduct.

**Count Fifteen: Promissory Estoppel**

82. Plaintiff incorporates and re-alleges the allegations set forth above.

83. Defendants obtained the Plaintiff's valuable services and confidential client information by promising to conduct the relationship for a period of five years for the benefit of all three parties. The Plaintiff was induced to bring the parties together and begin performing its obligations by the promise, which was reasonably calculated to induce such action. The Plaintiff took definite and substantial action in reliance on the Defendants' promise to the detriment of the Plaintiff. Injustice can be avoided only by refusing to allow the Defendants to rely upon the terms of the Dealer Agreement and Manufacturing Agreement, or alternatively, the terms that limit the term of the relationship and limit the damages that can be sought by Plaintiff, as those terms were procured by false promise and fraudulent conduct.

**Count Sixteen: Economic Duress**

84. Plaintiff incorporates and re-alleges the allegations set forth above.

85. The conduct of the Defendants as described above amounts to economic duress. In its communications with the Plaintiff, the Defendants have threatened to act in a manner totally inconsistent with the terms of their oral and written agreements and communications and in violation of their duty to act in good faith and fair dealing.

86. As a result of this duress, the Plaintiff's ability to profitably run its business has been seriously impaired. Accordingly, the Plaintiff requests that this Court enter judgment against the Defendants for the amount of actual damages it suffered as a result of such duress, including lost profits, in an amount within the jurisdictional limits of this Court. As a result of the Defendants' willful and deceitful actions, Plaintiff seeks recovery of exemplary damages.

**VII.**
**REQUESTS FOR DISCLOSURE**

87. Please take notice that pursuant to Rule 194 of the Texas Rules of Civil Procedure, the Defendants are hereby requested to disclose the information or material described below, within the time required by Texas Rule of Civil Procedure 194.3(a):

(a.) The correct names of the parties to this lawsuit;

(b.) The name, address and telephone number of any potential parties;

(c.) The legal theories and, in general, the factual bases of the responding party's claims or defenses;

(d.) The amount and any method of calculating economic damages;

(e.) The name, address and telephone number of persons having knowledge of relevant facts, along with a brief statement of each identified person's connection with the case;

(f.) For any testifying experts:

(1) The expert's name, address and telephone number;

(2) The subject matter on which the expert will testify;

(3) The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to your control, the documents reflecting such information;

(4) If the expert is retained by, employed by, or otherwise subject to your control:

(A.) All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by or prepared by or for the expert in anticipation of the expert's testimony; and,

(B.) The expert's current resume and bibliography;

(g.) Any discoverable indemnity and insuring agreements;

(h.) Any discoverable settlement agreements; and,

(i.) Any discoverable witness statements.

88. In the event that your response to this Request requires the production of voluminous documents, Plaintiff would request that the responsive documents be produced for inspection and/or reproduction in the offices of the undersigned attorneys, Friedman & Feiger, L.L.P. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, you are hereby advised that the production of documents in response to this Request operates to authenticate documents produced such that they may be used against you in any pretrial proceeding or at trial unless you timely and properly object to the authenticity of the documents in accordance with Rule 193.7 of the Texas Rules of Civil Procedure.

**VIII.**
**PRAYER**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff Mill Creek Press, Inc. d/b/a Advanced Art requests that, upon final hearing, the Court enter Judgment ordering rescission of the written contracts, declaring the contracts void and excusing both parties from all obligations under the contracts, enter judgment against the Defendants as requested above, including, but not limited to, reasonable attorneys' fees incurred by Plaintiff in prosecuting this action, costs and expenses of suit herein, pre-judgment and post-judgment interest on all monetary relief sought herein at the highest rates allowed by law; that Plaintiff be awarded equitable relief in the form of a constructive trust and injunctive relief as requested; and, that Plaintiff be granted such other and further relief, both at law and in equity, to which it may be justly entitled.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

By:________________________

**Lawrence J. Friedman**
State Bar No. 07469300
**James Robert Krause**
State Bar No. 11714525

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR PLAINTIFF**



3232 McKINNEY AVENUE
SUITE 1400
DALLAS, TX 75204-2429

TELEPHONE 214.740.1400
FACSIMILE 214.740.1499
BELLNUNNALLY.COM

WRITER'S DIRECT NUMBER:
214-740-1410

WRITER'S EMAIL ADDRESS
jeffl@bellnunnally.com

June 3, 2004

**Via Facsimile # (972) 788-2667 and**
**Regular First Class Mail**

James Robert Krause, Esq.
Del Mecham, Esq.
Friedman & Feiger
5301 Spring Valley Road, Ste. 200
Dallas, Texas 751254

Re: *Mill Creek Press, Inc., d/b/a Advanced Art v. Media Arts Group, Inc. and Home Interiors & Gifts, Inc.*, Cause No. 04-01021-F, In the 116th Judicial District Court, Dallas County, Texas

Dear Messrs. Krause and Mecham:

As you know, the Honorable Judge Robert H. Frost, in a May 26, 2004 letter to all parties, indicated that he was granting Defendants' motions relating to arbitration and requested an agreed order from the parties within two weeks of his letter – on or before June 9, 2004. Pursuant to the Court's letter, I have enclosed a proposed order reflecting the Court's rulings of April 21, 2004, and May 26, 2004. Assuming the enclosed order is agreeable, please sign the order in the space provided and return it to my attention on or before June 7, 2004. We will arrange for the submission of the order to the Court for signature.

Please feel free to call me should you have any questions or comments regarding the enclosed.

Very truly yours,

Jeffrey S. Lowenstein

Enclosure

cc: Jonathan Goldblatt, Esq.
Robert R. Gibbons, Esq. (firm)

EXHIBIT B

CAUSE NO. 04-01021-F

| | | |
|---|---|---|
| MILL CREEK PRESS, INC., d/b/a ADVANCED ART, Plaintiff, | § § § § | IN THE DISTRICT COURT |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| MEDIA ARTS GROUP, INC. and HOME INTERIORS & GIFTS, INC., Defendants. | § § § § | 116th JUDICIAL DISTRICT |

**ORDER OF DISMISSAL**

On this day the Court considered (1) Defendant Media Arts Group, Inc.'s Motion to Dismiss or Abate and (2) Defendant Home Interiors & Gifts, Inc.'s Joinder in Media Arts' Motion to Dismiss or Abate (together, the "Motion"), the response of Plaintiff Mill Creek Press, Inc. d/b/a Advanced Art, the supplemental briefing of all parties, all evidence, pleadings, and other papers on file in this action, and the arguments of counsel, and this Court found that the Motion should be GRANTED and the above-styled matter should be dismissed in its entirety. The Court further found that, pursuant to the agreements referenced in Plaintiff's First Amended Petition by and between the parties to the above-styled matter, the American Arbitration Association in San Jose, California has sole jurisdiction over any disputes arising under or relating to those agreements (including all claims asserted in the above-styled matter) and that any such claims shall be submitted to binding arbitration. It is therefore,

ORDERED that the Motion is hereby GRANTED. It is further

ORDERED that this case is DISMISSED in its entirety.

Signed this ________ day of ________________, 2004.

______________________
Judge Presiding

**AGREED AS TO FORM AND SUBSTANCE:**

**BELL NUNNALLY & MARTIN LLP**

By: [signature]
Robert R. Gibbons
State Bar No. 07845100
Jeffrey S. Lowenstein
State Bar No. 24007574

1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, Texas 75204
Telephone: (214) 740-1400
Telecopier: (214) 740-1499

**OF COUNSEL:**
**ALSCHULER GROSSMAN STEIN & KAHAN LLP**
Jonathan R. Goldblatt
1620 26th Street
North Tower, Fourth Floor
Santa Monica, CA 90404-4060
Telephone: (310) 907-1000
Telecopier: (310) 907-2000

**ATTORNEYS FOR DEFENDANTS MEDIA ARTS GROUP, INC. AND HOME INTERIORS & GIFTS, INC.**

**FRIEDMAN & FEIGER, L.L.P.**

By: ______________________
Lawrence J. Friedman
State Bar No. 07469300
James Robert Krause
State Bar No. 11714525
Del W. Mecham, Jr.
State Bar No. 24037085

5301 Spring Valley Road, Ste. 200
Dallas, TX 751254
Telephone: (972) 788-1400
Telecopier: (972) 788-2667

**ATTORNEYS FOR PLAINTIFF MILL CREEK PRESS, INC. d/b/a ADVANCED ART**